# United States Court of Appeals
## For the First Circuit

Nos. 22-1047, 22-1182

UNITED STATES, ex rel., ANTONI NARGOL and DAVID LANGTON; STATE OF ARKANSAS, STATE OF CALIFORNIA, CITY OF CHICAGO, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF DELAWARE, DISTRICT OF COLUMBIA, STATE OF FLORIDA, STATE OF GEORGIA, STATE OF HAWAII, STATE OF ILLINOIS, STATE OF INDIANA, STATE OF IOWA, STATE OF LOUISIANNA, STATE OF MARYLAND, STATE OF MICHIGAN, STATE OF MINNESOTA, STATE OF MONTANA, STATE OF NEVADA, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF NORTH CAROLINA, STATE OF OKLAHOMA, STATE OF RHODE ISLAND, STATE OF TENNESSEE, STATE OF TEXAS, COMMONWEALTH OF VIRGINIA, STATE OF WISCONSIN, COMMONWEALTH OF MASSACHUSETTS, CITY OF NEW YORK, STATE OF NEW HAMPSHIRE, STATE OF MISSOURI, STATE OF WASHINGTON, ex rel., ANTONI NARGOL and DAVID LANGTON,

Plaintiffs, Appellants,

v.

DEPUY ORTHOPAEDICS, INC.; DEPUY, INC.; JOHNSON & JOHNSON, SERVICES, INC.,

Defendants, Appellees.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. M. Page Kelley, U.S. Magistrate Judge]

Before

Barron, Chief Judge,
Lipez and Montecalvo, Circuit Judges.

Ross Eric Morrison, with whom Ross B. Brooks, Alastair Findeis, Brooks LLC, and Yankwitt LLP were on brief, for

appellants.

Adam R. Tarosky, with whom Mark D. Seltzer, Hannah R. Bornstein, Colin T. Missett, and Nixon Peabody LLP were on brief, for appellees.

May 18, 2023

**MONTECALVO, Circuit Judge.** Antoni Nargol and David Langton (collectively, "Relators") brought this qui tam suit against DePuy Orthopaedics, Inc., DePuy, Inc., and Johnson & Johnson Services, Inc. (collectively, "DePuy") under the False Claims Act ("FCA"), 31 U.S.C. § 3729, alleging a fraudulent scheme involving hip replacement devices sold by DePuy. The district court dismissed with prejudice Relators' case under Rule 41(b) of the Federal Rules of Civil Procedure for repeatedly failing to comply with applicable protective orders. Relators appeal the dismissal, arguing that the district court misinterpreted the protective orders and erred in finding that the operative complaint included information subject to one of those protective orders. For the reasons that follow, we affirm the decision of the district court and find that the district court did not abuse its discretion in dismissing the suit based on Relators' repeated violations of protective orders.

## I. Background

The underlying facts have been extensively discussed by this court previously in United States ex rel. Nargol v. DePuy Orthopaedics, Inc., 865 F.3d 29, 31-34 (1st Cir. 2017) (hereinafter, "DePuy I"). Thus, here, we examine only the relevant factual and procedural history as to the Rule 41(b) dismissal and summarize the necessary background.

## A. The First Amended Complaint

Relators brought this qui tam suit against DePuy under the FCA in May 2012. The complaint centered on DePuy's metal-on-metal hip-replacement device, marketed under DePuy's "Pinnacle" product line. DePuy I, 865 F.3d at 32. A first amended complaint was filed under seal in November 2013 ("FAC"). In July 2014, the United States declined to intervene.

## B. The MDL Matters

Prior to filing this action, Relators had been experts for the plaintiffs in a multidistrict litigation case pending in the Northern District of Ohio relating to "ASR" hip implants created by DePuy (the "ASR MDL"). In re: DePuy Orthopaedics, Inc. ASR Hip Implants Prods. Liab. Litig., No. 1:10-md-02197-DAK (N.D. Ohio). Relators were also consulted by the plaintiffs in another multidistrict litigation case pending in the Northern District of Texas relating to Pinnacle hip implants (the "Pinnacle MDL"). In re: DePuy Orthopaedics, Inc. Pinnacle Head Implant Prods. Liab. Litig., No. 3:11-md-02244 (N.D. Tex.). Protective orders regarding confidential DePuy product design information were issued in both of the multidistrict litigation cases (individually, the "ASR protective order" and the "Pinnacle protective order"; collectively, the "Protective Orders").

Beginning around May 2012, plaintiffs' counsel in the ASR MDL provided Relators with confidential DePuy documents, as

Relators had signed the ASR protective order. On November 8, 2013, Relators sent some of the data and drawings they had received in an August 2013 production to their expert in this case, QA Consulting, Inc. ("QA"). Included in those documents were DePuy Pinnacle engineering drawings that were originally produced with the designation "AttyEyesOnly" (the "Pinnacle Drawings").[1]

In 2013, while consulting in the Pinnacle MDL, Relators sought the engineering drawings for the Pinnacle device. Relator Langton ultimately received documents from plaintiffs' counsel related to the Pinnacle MDL and signed the Pinnacle protective order on the same day, November 15, 2013.[2] On November 17, 2013, Relators sent a spreadsheet to QA that included the dimensions and tolerances for the Pinnacle liner and head.

Before filing the FAC, Relator Langton traveled to Sweden and received a flash drive with additional documents on it from counsel for plaintiffs in one of the MDLs. On December 18, 2013, QA wrote a report (the "QA Report") summarizing its analysis and referencing Pinnacle design specifications; the design

---

[1] At some point, the "AttyEyesOnly" label was removed from the document; however, it is unclear when or by whom. Assuming Relators were not the ones to remove the label, Relators were still informed of the confidential nature of the Pinnacle Drawings soon thereafter.

[2] Relator Langton signed the Pinnacle protective order on this day; however, Relator Nargol did not sign the Pinnacle protective order until May 5, 2014.

specifications were the same as those stated in some of the Pinnacle Drawings. Some of the analyses in the QA Report also referenced documents Relators had received as expert witnesses in the MDLs, particularly those documents relating to the ASR hip implant.

On October 16, 2014, Relators filed a motion to intervene in the ASR MDL and requested a modification of the ASR protective order. Relators disclosed to the Ohio court that they had given documents produced by DePuy in the ASR MDL to the government and to QA in connection with this qui tam action. On January 5, 2015, the Ohio court denied Relators' motions, holding that granting intervention and modification of the ASR protective order would be prejudicial to both parties in the ASR MDL. The Ohio court noted that

> [a]llowing . . . modification of the [ASR protective order] rewards the [Relators] for using confidential information they obtained in their roles as experts; information which would not have been available to them absent their special employment.
>
> * * *
>
> If the Court agreed with the [Relators'] request, these retained experts would be free to use the knowledge they obtain during this litigation for their own benefit. This result is unacceptable.

The Ohio court then prohibited documents produced in the ASR MDL from being used in the qui tam litigation, finding that Relators

had already used these documents in the filing of the FAC in violation of the ASR protective order.

### C. The Second Amended Complaint & DePuy I

Several months later, on March 18, 2015, the district court here heard argument regarding Relators' motion to partially unseal the FAC. In reviewing the order from the Ohio court, the district court noted that it had to assume that the order there was "valid" and, "therefore, assume that the [R]elators did, in fact, make use of confidential documents[.]" For that reason, the district court found that the FAC was "tainted[.]" The motion to partially unseal was then denied, and the district court entered an order stating that should Relators file an amended complaint, it must

> be accompanied by affidavits from [R]elators sworn to under the pains of perjury that certify that the second amended complaint does not violate any relevant court order, including the protective orders issued in the MDL proceedings in the Northern District of Ohio or the Northern District of Texas or the order issued by the court in Ohio on January 5, 2015.

On May 4, 2015, Relators filed the Second Amended Complaint ("SAC") under seal with the necessary affidavits attached, stating that the SAC does not violate any relevant protective order. Although the district court ultimately allowed the SAC, at a related hearing, the district court repeatedly stated that should the SAC be found to violate the Protective Orders,

then the court would draw an adverse inference against Relators. On August 24, 2015, Relators requested that the SAC be unsealed, which DePuy assented to. On February 2, 2016, the district court granted the motion to unseal.

Also in early 2016, on DePuy's motion, the district court dismissed the SAC, finding that Relators "failed to identify any specific false claims" and "failed to identify even a single representative false claim for payment" or cite sufficient factual evidence regarding the possibility of fraud. Depuy I, 865 F.3d at 33. On April 11, 2016, the district court addressed Relators' motion for reconsideration and, in addressing Relators' claims regarding new evidence, observed that the Relators were not making the critical differentiation between confidential documents and the "facts that underlie those documents" and so were not representing that they had drafted the SAC without impermissibly relying on confidential documents. The district court emphasized that "the [R]elators could have used basic investigative tactics to obtain those underlying facts without violating" the Protective Orders prior to filing the SAC.

Relators appealed, and this court affirmed the district court's dismissal of all claims that were based on a design-defect theory of fraud. DePuy I, 865 F.3d at 36-37. However, we vacated the district court's dismissal as to allegations of a "fraudulent scheme with 'reliable indicia that lead to a strong inference that

claims were actually submitted' . . . for government reimbursement from the United States and from the state of New York." Id. at 41 (quoting United States ex rel. Duxbury v. Ortho Biotech Prods., L.P., 579 F.3d 13, 29 (1st Cir. 2009)).  The matter was remanded for resolution of the surviving claims -- counts 1, 2, and 27. Id. at 43.  On October 27, 2017, Relators filed a corrected Second Amended Complaint ("Corrected SAC"), which was identical to the SAC, except it only included the surviving claims.

### D. The Corrected SAC & Related Orders

The Corrected SAC, like the SAC, included a statistical analysis calculating the alleged rates at which the Pinnacle products were defective.  That statistical analysis was derived from the QA Report, which had relied on Pinnacle product measurements, specifically the Pinnacle head and liner's nominal diameter and associated tolerances.  That analysis also formed the basis of the surviving falsity allegations -- allegations that the "Pinnacle . . . devices did not materially comport with the specifications of the FDA approval." DePuy I, 865 F.3d at 43.

As discovery ensued, the district court entered a stipulated protective order (the "qui tam protective order") in this case.  In December 2019, Relators moved for clarification of that order and sought guidance from the district court regarding what documents that they had received as experts in the MDL matters could be used in this litigation; DePuy also moved to compel

certain documents that Relators had provided to QA.  In response to Relators' clarification request, the district court emphasized that Relators "are prohibited from using any of the information they received in their capacities as experts in the MDL litigations to prosecute the present case."  In response to DePuy's motion to compel, the district court also required Relators to provide DePuy with "all materials they gave to QA in the present case, including information they generated or received as experts in the MDL litigation, and indicate when each piece of information was provided to QA."

In December 2020, DePuy identified the Pinnacle Drawings as previously produced in the Pinnacle MDL and being utilized by Relators in the litigation at hand.  DePuy claimed that the Pinnacle Drawings contained trade secrets in the form of the precise nominal design dimensions and associated tolerances of the 36mm Pinnacle metal liner and head to a particular decimal place. DePuy alleged that the Pinnacle Drawings, which were subject to the Protective Orders, were sent by Relators to QA to perform the calculations in the QA Report.  Relators subsequently requested leave to amend the Corrected SAC to remove information related to the Pinnacle Drawings.  Relators also maintained that they were unaware that the Pinnacle Drawings were confidential.

In February 2021, Relators identified two documents, Exhibits D-433 and D-467, introduced into evidence years earlier

in a Pinnacle MDL bellwether trial; DePuy later introduced those same documents in another case in 2016. See Paoli, et al. v. DePuy Orthopaedics, Inc., et al., No. 3:12-cv-4975-K (N.D. Tex.); Aoki v. DePuy Orthopaedics, Inc., et al., No. 3:13-cv-1071-K (N.D. Tex.). Exhibit D-467 contained the Pinnacle liner diameter and tolerances as stated in the documents sent to QA and the head diameter in inches to the fifth decimal place; this exhibit remained public. However, Exhibit D-433 -- which contained the Pinnacle head dimensions to the same decimal point as stated in the information sent by Relators to QA -- along with other documents in the Paoli trial, were later redacted to prevent public disclosure. Based on Relators' identification of these exhibits, Relators stated that they believed this information was public and that their earlier motion to amend was moot.

On March 5, 2021, DePuy filed a motion to strike the allegations related to manufacturing defect rates in the Corrected SAC and to dismiss the Corrected SAC. DePuy argued that Relators utilized confidential information they received as experts in the MDL matters in drafting the Corrected SAC. Specifically, DePuy noted that Relators had never identified the design specifications, to the decimal place provided to QA, for the Pinnacle head (the "Subject Information") in the public domain.[3]

---

[3] Although DePuy had previously claimed that the Pinnacle liner was subject to the Protective Orders, DePuy ultimately agreed

As a result, DePuy argued that all portions of the Corrected SAC that incorporated the Subject Information should be struck, which would lead to dismissal based on the Corrected SAC lacking sufficient particularity, or, alternatively, that the Corrected SAC should be dismissed based on Relators' alleged repeated violations of the Protective Orders or abuse of the discovery process.

On July 6, 2021, the district court denied DePuy's motion, stating that "DePuy has failed to establish that any information in the [Corrected SAC] that previously may have been restricted was not in the public domain at the time of the filing of the [Corrected] SAC." The district court further found that "DePuy thus has failed to demonstrate that Relators violated any relevant court order in pleading allegations in the [Corrected] SAC." DePuy filed a timely motion for reconsideration, arguing that the district court applied the improper legal standard in assessing DePuy's motion to strike and dismiss. DePuy further argued that the burden of identifying the origin of information contained in the Corrected SAC should have been placed on Relators based on the district court's previous statements and orders.

On September 16, 2021, the district court ordered Relators to submit a supplemental brief addressing "the sole issue

_____

that the Pinnacle liner dimensions were public at the time of the filing the SAC.

- 12 -

of how they were able to determine the upper and lower tolerance levels for the Pinnacle [h]ead to five decimal places." Relators pointed to the Pinnacle liner drawings, which were public at the time of the filing of the SAC and contained the nominal diameter and tolerance of the Pinnacle liner. Relators claimed that, from that information, they calculated the diametrical clearance from the liner to find the Pinnacle head diameter. Relators then stated that they repeatedly converted and rounded the number back and forth between the metric system and the imperial system, resulting in the value they ultimately provided to QA for the Pinnacle head diameter. Relators also claimed that they knew the number of decimal places to round the value to based on various DePuy documents. On October 12, 2021, in an affidavit from Relator Langton, Relators identified, for the first time, a 613-page document available on an educational website that purported to depict the Subject Information within several of its pages. This document, however, was uploaded to that website in 2018, years after the SAC was filed.

On November 10, 2021, the district court granted the motion for reconsideration -- finding it had made a legal error in its prior decision regarding the burden placed on DePuy, struck allegations involving the Subject Information from the Corrected SAC and dismissed the same under Rule 41(b), finding that confidential information had been utilized within it. That

decision was filed under seal. The district court noted that "Relators have been warned by multiple courts that they are required to comply with the protective and court orders that govern their use of that confidential information" and that they "have been chastised repeatedly for failing to comply with those orders." The district court also found that Relators' explanation for how they arrived at the Subject Information sent to QA was convoluted and, ultimately, unbelievable; the district court instead accepted DePuy's "simpler explanation" that Relators acquired the Subject Information from the confidential Pinnacle Drawings, which would have provided all the information Relators then supplied to QA.

As to the use of the Subject Information, the district court found that "at best, [Relators'] actions are the result of poor record-keeping and investigation into the source of their allegations, while at worst, their actions could be said to demonstrate an intentional and repeated disregard of court orders." Lastly, the district court held that allowing Relators to amend their complaint for a third time at this late hour "would unfairly prejudice DePuy and reward [R]elators for their accumulated missteps." In accordance with that opinion, the order of dismissal entered on December 7, 2021.

The district court requested the parties confer and propose redactions to its decision "so that an unredacted or partially redacted version of the order may be placed on the public

docket." DePuy provided proposed redactions to the decision to the district court. However, Relators objected to DePuy's proposed redactions, specifically as to the redaction of the Subject Information, citing Rule 46 of the Federal Rules of Civil Procedure. The district court viewed this opposition as an "improper" motion for reconsideration, as it repeated the same arguments presented in Relators' opposition to the motion to dismiss. As a result, the district court accepted DePuy's proposed redactions to its decision. The redacted decision was then placed on the public docket.

Relators subsequently filed a motion for reconsideration and to set aside, amend, or alter the district court's final judgment. Relators proffered "new" evidence in support of their motion and argued that the district court applied the wrong legal standard. The district court found that the evidence Relators pointed to was not "new . . . but rather evidence that -- with due diligence -- [R]elators could have brought to the court's attention any time during the eighteen months that the parties were engaged in contesting whether the information at issue was public." Given the district court had recently reconsidered its dismissal decision when considering Relators' objections to the redaction of such, it held that a further examination of those same arguments was "unnecessary" at that juncture. Accordingly, Relators' motion

for reconsideration and to alter or amend was denied on January 21, 2022.

With respect to the Corrected SAC, Relators now appeal: (1) the granting of DePuy's motion for reconsideration and (2) the Rule 41(b) dismissal of the Corrected SAC; (3) the granting of DePuy's motions to seal and (4) to strike; and (5) the denial of Relators' motion for reconsideration.[4]

## II. Discussion

### A. DePuy's Motion for Reconsideration

The granting of a motion for reconsideration is reviewed for abuse of discretion. Biltcliffe v. CitiMortgage, Inc., 772 F.3d 925, 930 (1st Cir. 2014) (citing Int'l Strategies Grp., Ltd. v. Greenberg Traurig, LLP, 482 F.3d 1, 6 (1st Cir. 2007)). Motions for reconsideration are "granted sparingly, and only when 'the original judgment evidenced a manifest error of law, if there is newly discovered evidence, or in certain other narrow situations.'" Id. (quoting Global Naps, Inc. v. Verizon New England, Inc., 489 F.3d 13, 25 (1st Cir. 2007)).

Relators state that they "do not accept [the] notion" that it was Relators' burden to show that the Subject Information

---

[4] Although Relators state that they are appealing the denial of their motion for reconsideration, they have not presented any arguments in support of such. Therefore, any arguments related to the appeal of Relators' motion for reconsideration are waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

was public when the SAC was filed. However, before this court, they have not put forth any arguments to support that contention. Relators give no reasoning as to why, after receiving multiple warnings over the course of this decade-long litigation, the district court should not do exactly as it promised and place the burden on Relators to show that information contained in the SAC was public at the time of its filing.

Instead of addressing the pertinent issue, Relators argue, "[a]side from the district court's shifting of the burden from Defendants to Relators, the district court's Dismissal Orders failed to explain what evidence, if any, it had initially overlooked . . . ." Relators fail to appreciate that the district court need not identify newly discovered evidence if it has identified an error of law. See IDS Prop. Cas. Ins. Co. v. Gov't Emps. Ins. Co., 985 F.3d 41, 51 (1st Cir. 2021) ("Where the district court believes with good reason that it based its initial decision on an error of law, or if its ruling patently misunderstood a party or misapprehended the question before it, we will not disturb the court's discretion to allow a motion for reconsideration." (cleaned up)). Here, where the district court has identified an error of law in its earlier decision -- namely that it applied an improper burden on the moving party -- we find no abuse of discretion in the granting of a motion for reconsideration.

## B. Rule 41(b) Dismissal

This court reviews dismissals under Rule 41(b) for abuse of discretion.  Malot v. Dorado Beach Cottages Assocs., 478 F.3d 40, 43 (1st Cir. 2007) (citing Angulo-Alvarez v. Aponte de la Torre, 170 F.3d 246, 251 (1st Cir. 1999)).  Within our review for abuse of discretion, legal questions are reviewed de novo, factual findings for clear error, and issues of judgment or legal application are reviewed for abuse of discretion.  See Victim Rts. Law Ctr. v. Rosenfelt, 988 F.3d 556, 559 (1st Cir. 2021).  The interpretation of an order presents a question of law; however, appellate deference is appropriate when a district court is interpreting its own order.  See Monarch Life Ins. Co. v. Ropes & Gray, 65 F.3d 973, 983 (1st Cir. 1995).

"This standard of review is not appellant-friendly -- and a sanctioned litigant bears a weighty burden in attempting to show that an abuse occurred."  Vallejo v. Santini-Padilla, 607 F.3d 1, 8 (1st Cir. 2010) (quoting Young v. Gordon, 330 F.3d 76, 81 (1st Cir. 2003)).  When a court has dismissed a case for failure by a party to adhere to court orders, those parties "have 'not received a sympathetic ear from us.'"  Malot, 478 F.3d at 43 (quoting Damiani v. R.I. Hosp., 704 F.2d 12, 17 (1st Cir. 1983)); see McKeague v. One World Techs., Inc., 858 F.3d 703, 707 (1st Cir. 2017) ("Even schoolchildren know that changing the rules mid-course to benefit someone who flouted them creates subtle and

even substantial risks of unfairness."). However, we "balance the court's venerable authority over case management with the larger concerns of justice, including the strong presumption in favor of deciding cases on the merits." Id. (citing Torres-Vargas v. Pereira, 431 F.3d 389, 392 (1st Cir. 2005); Batiz Chamorro v. Puerto Rican Cars, Inc., 304 F.3d 1, 4 (1st Cir. 2002)).

### i. Violations of the Protective Orders

We first address Relators' primary argument that they never violated any of the Protective Orders in filing the SAC. To support this argument, Relators contend that the Subject Information was already public at the time of the filing of the SAC and point to the public filing of Exhibits D-433 and D-467 in the Paoli trial in 2014. As to any discrepancy between the allegedly publicly available numbers and the numbers utilized in the drafting of the SAC, Relators reassert their mathematical processes involving repeated conversions and rounding of the numbers involved; these processes make little mathematical sense. Relators also argue that they knew of the Subject Information independent of any MDL discovery through the use of a machine in Relators' laboratory. With these contradictory explanations as a background, Relators contend that the district court misinterpreted the Protective Orders and the district court's own prior orders regarding the same.

As to the interpretation of the Protective Orders, "[a] district court speaks to the parties and the court of appeals primarily through its orders." Negrón-Almeda v. Santiago, 528 F.3d 15, 22 (1st Cir. 2008). "[W]hen a court's order is clear and unambiguous, neither a party nor a reviewing court can disregard its plain language 'simply as a matter of guesswork or in an effort to suit interpretive convenience.'" Id. at 23 (quoting Alstom Caribe, Inc. v. Geo. P. Reintjes Co., 484 F.3d 106, 115 (1st Cir. 2007)). However, when the wording is imprecise, this court "can comb relevant parts of the record to discern the authoring court's intention." Id. (internal citations omitted).

The language of the Protective Orders, the Ohio court's January 5, 2015 order, and the prior orders of the Massachusetts district court are clear -- Relators were not to use any of the information they learned through their work as experts in the MDLs in this litigation. As a starting point, Relators once again fail to distinguish between confidential documents and the facts underlying those documents. It is true that once any of the information Relators learned as experts subsequently became public knowledge, then Relators would have been free to use that information in their qui tam suit. The district court made it clear -- in requiring Relators to file affidavits with the SAC -- that Relators were responsible from the get-go to have publicly available sources backing their allegations. The

district court also noted that Relators could use "basic investigative tactics" prior to filing the SAC to identify public sources of the information. However, the district court found that Relators did not know that the Pinnacle liner dimensions were public until January 2021, years after Relators signed the affidavits stating that the SAC did not contain any confidential information. Although DePuy now concedes that the Pinnacle liner dimensions are public, that finding does not ameliorate the troubling situation Relators have created. The district court did not understand its own orders to allow Relators to file the SAC, affirm in sworn affidavits the information contained therein was not confidential, and then later go on a fishing expedition to identify public sources for the information utilized in the SAC. We see no error in the district court's conclusion, as the alternative would be nonsensical and directly contrary to the purpose of the Protective Orders.

As to the Pinnacle head dimensions, the district court held that Relator Langton's explanation as to how he arrived at the Subject Information sent to QA "lack[ed] credibility[.]" Credibility findings are "obviously decisions vested firmly in the sound discretion of the district court[.]" Applewood Landscape & Nursery Co. v. Hollingsworth, 884 F.2d 1502, 1509 (1st Cir. 1989). Relators have not pointed to an alternative public source for the Subject Information. After a careful review of the record, it is

evident that the district court had sufficient facts to adequately support its finding that Relators utilized the Subject Information in drafting the SAC in violation of the Protective Orders.

### ii. Appropriateness of Dismissal

As the SAC, and in turn the Corrected SAC, violated the Protective Orders, we now turn to the issue of whether dismissal was the appropriate sanction, guided again by our abuse of discretion standard. Rule 41(b) states, in relevant part, "[i]f the plaintiff fails . . . to comply with . . . a court order, a defendant may move to dismiss the action or any claim against it. Unless the dismissal order states otherwise, a dismissal under this subdivision (b) . . . operates as an adjudication on the merits." The appropriateness of a sanction under Rule 41(b) is dependent on the circumstances of the case at issue. Malot, 478 F.3d at 43-44.

"In order to operate effectively and administer justice properly, courts must have the leeway 'to establish orderly processes and manage their own affairs.'" Vázquez-Rijos v. Anhang, 654 F.3d 122, 127 (1st Cir. 2011) (quoting Young, 330 F.3d at 81). "The authority to order sanctions in appropriate cases is a necessary component of that capability." Young, 330 F.3d at 81. Accordingly, the sanction of dismissal is important, and, "[m]oreover, in the federal system the Civil Rules reinforce and augment the inherent power of district courts to dismiss cases for

- 22 -

disregard of judicial orders." Id. However, "dismissal with prejudice is a harsh sanction, which should be employed only when a plaintiff's misconduct has been extreme and only after the district court has determined that none of the lesser sanctions available to it would truly be appropriate." Malot, 478 F.3d at 44 (quoting Est. of Solís-Rivera v. United States, 993 F.2d 1, 2 (1st Cir. 1993)) (cleaned up).

We have outlined "a non-exclusive list of substantive factors to consider when reviewing sanctions orders: 'the severity of the violation, . . . the deliberateness vel non of the misconduct, mitigating excuses, prejudice to the other side and to the operations of the court, and the adequacy of lesser sanctions.'" Id. (quoting Benítez-García v. González-Vega, 486 F.3d 1, 5 (1st Cir. 2006)). This court is "[m]indful that case management is a fact-specific matter within the ken of the district court[.]" Robson v. Hallenbeck, 81 F.3d 1, 2-3 (1st Cir. 1996).

"[T]he disregard of court orders qualifies as extreme behavior, and we do not take such insolence lightly." Malot, 478 F.3d at 44. This is particularly true when a plaintiff displays a pattern of "repeatedly flouting court orders." Id. (quoting Benítez-García, 486 F.3d at 5). Below, the district court found that Relators violated the Protective Orders not only by including confidential information in the Corrected SAC, but "repeatedly over the course of this nearly decade-long litigation, evidencing

a pattern of disregarding orders from this and other courts." This recurrent conduct of disregarding the orders of several courts emphasizes the severity of Relators' behavior.

The district court also found that DePuy had been prejudiced by Relators' actions. Beginning in 2015, Relators had many opportunities to identify the sources of the information contained in the SAC. Relators also certified to the district court, through their affidavits, that the SAC did not contain confidential information. Had Relators not acted in this manner, DePuy could have potentially identified the Subject Information as utilized in the SAC years earlier. Instead, DePuy had to repeatedly file motions with the district court in an attempt to gather this information from Relators -- expending an enormous amount of time and energy.

When reviewing the adequacy of lesser sanctions, we look to determine whether the district court gave an "explanation for its conclusion that any lesser sanction would be inappropriate." Malot, 478 F.3d at 45. However, the explanation need not be explicit in the district court's decision. See Vázquez-Rijos, 654 F.3d at 130. "[T]he law is well established in this circuit that where a noncompliant litigant has manifested a disregard for orders of the court and been suitably forewarned of the consequences of continued intransigence, a trial judge need not first exhaust milder sanctions before resorting to dismissal." HMG Prop.

Invest., Inc. v. Parque Indus. Rio Canas, Inc., 847 F.2d 908, 918 (1st Cir. 1988).

The district court found that "[r]epeated attempts by this court and others to hold [R]elators to their obligations have proven futile, making dismissal the most appropriate sanction, particularly when the court cannot trust that the remaining allegations of the [SAC] are untainted." This conclusion was well-supported by the record. Further, Relators had been on alert for years that the district court was concerned with the use of confidential information. The district court clearly believed, and reasonably so, that given the pattern of disregarding court orders in the face of these warnings, a lesser sanction would have had no deterrent effect on Relators. Therefore, the district court need not resort to a lesser, and likely inadequate, sanction.

There is also a procedural dimension to our review, "which addresses concerns such as notice, opportunity to be heard, and the court's explanation for its choice of sanction." Malot, 478 F.3d at 44. Although prior notice is an "important consideration[,]" such is "not a prerequisite to dismissal with prejudice[.]" Id. at 45 (citing Robson, 81 F.3d at 3). The notice consideration can weigh in favor of imposing dismissal where the "disregard of a prior warning from the court exacerbates the offense" and can weigh against imposing dismissal where "the lack of warning sometimes mitigates it." Vallejo, 607 F.3d at 9

(quoting Robson, 81 F.3d at 3).  A plaintiff can also be put on notice of the risk of dismissal by the filing of a motion to dismiss.  Id. at 10.

Relators had an opportunity to respond to DePuy's initial motion to dismiss and to strike and took that opportunity. Further, after receiving DePuy's motion for reconsideration, the district court specifically requested additional information from Relators to assist the court in addressing the pending motions. The record clearly shows that Relators had notice of the possible dismissal, as well as an opportunity to respond.

We accordingly find that the district court did not abuse its discretion in finding that Relators had, once again, violated the Protective Orders and in imposing the weighty sanction of dismissal with prejudice.

### C. Sealing Orders

Relators also challenge the district court's orders sealing Exhibit D-433 and redacting its dismissal order.  In support of this contention, Relators reiterate many of their prior arguments that the Subject Information was public and, as a result, believe it was improper for the court to seal and redact these documents in contravention with the right to public access.

"Courts have long recognized that public monitoring of the judicial system fosters the important values of quality, honesty and respect for our legal system."  United States v.

Kravetz, 706 F.3d 47, 52 (1st Cir. 2013) (quoting In re Providence J., 293 F.3d 1, 9 (1st Cir. 2002)). Within the purview of common law public access, when the district court, after reviewing the facts of the case at hand, allows a motion to seal documents or a portion thereof, this court's review is only for abuse of discretion. See F.T.C. v. Standard Fin. Mgmt. Corp., 830 F.2d 404, 411 (1st Cir. 1987).

In determining whether the common law right of access applies, the court must determine whether the documents are "judicial records." Kravetz, 706 F.3d at 54. "Such records are those 'materials on which a court relies in determining the litigants' substantive rights.'" Id. (quoting In re Providence J., 293 F.3d at 9-10). These materials are distinguishable from documents that "'relate merely to the judge's role in management of the trial' and therefore 'play no role in the adjudication process.'" Id. (quoting In re Boston Herald, Inc., 321 F.3d 174, 189 (1st Cir. 2003)) (cleaned up). Put another way, the term "judicial record" is meant to "distinguish documents presented to a judge in connection with a discovery dispute from the record on which a judge actually decides the central issues in a case." In re Boston Herald, Inc., 321 F.3d at 189.

"[R]elevant documents which are submitted to, and accepted by, a court of competent jurisdiction in the course of adjudicatory proceedings, become documents to which the

- 27 -

presumption of public access applies." Standard Fin. Mgmt. Corp., 830 F.2d at 409. However, "we also have concluded that no right of access attaches to civil discovery motions themselves or materials filed with them." Kravetz, 706 F.3d at 55. Once the court determines that the presumption of public access applies, it must then "weigh the presumptively paramount right of the public to know against the competing private interests at stake." Standard Fin. Mgmt. Corp., 830 F.2d at 410 (citing In re Knoxville News-Sentinel Co., 723 F.2d 470, 478 (6th Cir. 1983)).

Relators primarily argue here that the documents or information therein that were sealed were already public, and, therefore, any sealing thereof was unwarranted. However, even accepting this contention, this court has never adopted a bright line rule banning the protection of public documents. See Poliquin v. Garden Way, Inc., 989 F.2d 527, 534 (1st Cir. 1993). Therefore, we continue with our typical analysis as to the common law right to public access.

As to Exhibit D-433, although this document may have been filed as an exhibit in another case -- and was therefore clearly a judicial record there -- that does not necessitate a finding that Exhibit D-433 is a judicial record in this matter. The district court did not examine Exhibit D-433 for its substance in this litigation, but rather to determine whether there was a violation of the Protective Orders.

However, even assuming, without deciding, that both documents are judicial records, "[t]he 'presumptive right of access attaches to those materials which <u>properly</u> come before the court . . . .'" <u>Philibotte</u> v. <u>Nisource Corp. Servs. Co.</u>, 793 F.3d 159, 162 n.2 (1st Cir. 2015) (quoting <u>In re Providence J.</u>, 293 at 9). Here, the crux of the district court's decision was that Relators had improperly utilized the Subject Information in the constructing and filing of the SAC in violation of the Protective Orders; we have now affirmed that decision. Therefore, the Subject Information, contained in both Exhibit D-433 and the dismissal order, was never properly before the district court. Thus, it was clearly within the district court's discretion to seal any reference to the Subject Information because the presumptive right of access did not apply.

### D. Amendment of the Corrected SAC

Lastly, Relators take issue with the district court's decision to not allow Relators to amend the Corrected SAC. Relators argue that even if the confidential Subject Information was incorporated into the Corrected SAC, the Corrected SAC could still have survived without the use of the Subject Information. Relators' argument misses the mark. As discussed above, the Corrected SAC was not dismissed based on futility or lack of particularity, but instead was dismissed as a sanction under Rule 41(b). Allowing Relators to amend their pleading for a third time

at this late hour and under the circumstances at hand would be in contravention of this court's affirmance of the district court's holding that a lesser sanction would be inadequate.

## III. Conclusion

A close reading of the factual and procedural history here leads to but one conclusion: the district court did not abuse its discretion in dismissing Relators' Corrected SAC under Rule 41(b). For the reasons detailed above, the orders of the district court are affirmed.